UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
RICHARD MCNICHOL,                                    :
                  Plaintiff,           :
v.                                                                  :         **OPINION AND ORDER**
                                                       :
SHERIFF LOU FALCO, sued in his official and    :
individual capacities; COUNTY OF                      :         16 CV 2119 (VB)
ROCKLAND; and CHIEF ANTHONY                    :
VOLPE, sued in his official and individual          :
capacities,                                                       :
                        Defendants.      :
--------------------------------------------------------------x
JOHN COCUZZA; JACQUELIN MILLIEN;           :
GREG ESPOSITO; STEFAN TCHOR;                  :
LARRY LANS; and MELISSA SEMINARA,          :
                  Plaintiffs,          :
v.                                                                  :         16 CV 9868 (VB)
                                                       :
SHERIFF LOU FALCO and COUNTY OF             :
ROCKLAND,                                                   :
                  Defendants.      :
--------------------------------------------------------------x

Briccetti, J.:

       Plaintiffs Richard McNichol, John Cocuzza, Jacquelin Millien, Greg Esposito, Stefan

Tchor, Larry Lans, and Melissa Seminara bring these related actions under 42 U.S.C. § 1983,

against defendants the County of Rockland (the "County"), and Sheriff Louis Falco III and Chief

Anthony Volpe of the County Sheriff's Department.  Plaintiffs allege defendants sought

plaintiffs' termination and retaliated against them for exercising their First Amendment rights to

association, and selectively prosecuted plaintiffs in violation of the Fourteenth Amendment.

       Before the Court is defendants' motion for summary judgment.  (16 Civ. 9868 Doc.

#109).[1]

---

[1]      All record citations herein refer to documents electronically filed in 16 Civ. 9868.

For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

The parties have submitted memoranda of law, statements of material facts pursuant to Local Civil Rule 56.1, declarations, affidavits, and supporting exhibits.  Together, these documents reflect the following factual background.

Plaintiffs are former corrections officers of the Rockland County Jail (the "Jail"), which operates under the purview of the Sheriff's Department.

At all relevant times, plaintiffs were members of the Correction Officers Benevolent Association of Rockland County (the "union").

In November 2011, with the union's support, defendant Louis Falco III was elected Sheriff of Rockland County.

I.    Vasquez Public Announcement for 2015 Sheriff Election

At a press conference in March 2015, Woodbury Police Chief Richard Vasquez publicly announced his candidacy to challenge Sheriff Falco in the 2015 election for Rockland County Sheriff.  The conference was held at the County Courthouse.  The union endorsed Vasquez at this event.

Cocuzza, McNichol, Millien, Seminara, and Tchor appeared with Vasquez at the conference, and were photographed with Vasquez by John Kezek, who plaintiffs claim was a friend of Sheriff Falco and whose son is a corrections officer at the Jail.  At the time, Cocuzza was union president, McNichol was union vice president, and Millien was an executive board member of the union.

On November 3, 2015, Sheriff Falco was reelected.

II.     <u>Relationship between the Union and Sheriff Falco</u>

During Sheriff Falco's tenure, he and the union were involved in numerous labor relations disputes both before and after his reelection.  For example, in October 2014, the union challenged Sheriff's Falco's unilateral deletion of a contract provision in the union's collective bargaining agreement respecting female corrections officers' employment.  (<u>See</u> Doc. #123 ("Goldman Decl.") Exs. 1, 2).

In the context of this dispute, plaintiffs claim the union learned Sheriff's Department administration attempted to meet with female officers without union representation, and in response, the union, under Cocuzza's leadership, filed a complaint with the New York State Public Employment Relations Board (the "PERB complaint").  Cocuzza and McNichol attended hearings regarding the PERB complaint, and the matter was still ongoing at the time Cocuzza and McNichol's employment was terminated.

In addition, a March 30, 2015, article published in <u>The Chief-Leader</u> newspaper quoted Sheriff Falco explaining that tension between Falco and the union was the result of disagreements over overtime availability, and referencing specific overtime accrued by Cocuzza and McNichol, the union's primary leadership.  (Goldman Decl. Ex. 4).

Moreover, according to plaintiffs, at a public event in June 2015, Sheriff Falco expressed to McNichol discontent with the union's refusal to allow him to interview with the union before it endorsed Vasquez.  (Doc. #135 ("McNichol Decl.") ¶ 13).  According to McNichol, "Falco remarked to us, in substance, that we would see what will happen when he wins."  (<u>Id</u>.).

III.    <u>McNichol's Disciplinary Charges and Resignation</u>

According to defendants, on September 23, 2015, Sergeant ("Sgt.") Louis Falco IV,

Sheriff Falco's son, witnessed McNichol sleeping at his assigned post, the "programs" desk, at

the Jail.  (Doc. #121 ("Weissman Decl.") Ex. 36).  Sgt. Falco reported this incident to

Lieutenants Kleber and John Dawson, and asked if video footage of McNichol's September 23,

2015, shift could be reviewed to determine for how long McNichol was not alert.  Sgt. Falco

requested and obtained memos from four officers present when Sgt. Falco allegedly saw

McNichol sleeping, containing these officers' recollections of the event.  None of the officers

noted McNichol had been sleeping.  (<u>See</u> <u>generally</u> Weissman Decl. Ex. 37).

According to defendants, after Kleber and Dawson reviewed video of the September 23

shift, Dawson reviewed footage of several of McNichol's past programs desk shifts, concluded

McNichol had fallen asleep during four of them, and notified Chief Volpe about the videos.

Dawson also reviewed several videos of McNichol's past suicide and precautionary

watch shifts, and concluded McNichol was asleep during two suicide watches and seven

precautionary watches.  According to defendants, suicide watches require constant observation

of inmates, and precautionary watches require supervision of multiple inmates and that the

supervising officer check on each inmate at least every fifteen minutes.  Defendants then

reviewed logbook entries corresponding with the dates of these videos, and determined

McNichol had falsified the logbooks by claiming he had made all required observations during

these shifts.

On November 5, 2015, two days after Sheriff Falco won the election, Volpe issued

disciplinary charges against McNichol and referred the matter to Detective Sergeant Kenneth

Johnston to determine whether McNichol's falsification of logbooks amounted to criminal

conduct.  Johnston concluded such conduct was criminal.  Defendants then gave McNichol a

choice to resign or face criminal charges.

McNichol resigned on December 11, 2015.

IV.     Lans's Resignation

According to defendants, while reviewing McNichol's shift videos, Dawson also saw

footage depicting several other officers sleeping on the job.  Two such officers were Lans and

Cocuzza.  (Weissman Decl. Ex. 81) (containing memo dated January 1, 2016).

The videos depicted Lans fully reclined and sleeping on shift, and remaining in his chair

for up to four hours at a time without checking on inmates during precautionary watch.  Dawson

shared this information with Volpe, who, on December 15, 2015, referred the information to

Johnston.  Johnston concluded Lans falsified logbook entries by claiming to have made inmate

observations when he had not.

Disciplinary charges against Lans were drafted, but never signed.  (Weissman Decl. Ex.

99).  On January 7, 2016, Lans resigned from his position as a corrections officer "due to

retirement purposes."  (Id. Ex. 100).

V.     Cocuzza's Disciplinary and Criminal Charges, and Resignation

As noted above, according to defendants, while reviewing video to further investigate

McNichol's employment conduct, Dawson also came across footage of Cocuzza sleeping during

suicide and precautionary watches, and failing to make frequent checks on inmates during the

latter.  Volpe reviewed Cocuzza's logbooks, and found them to be falsified.  Sheriff Falco

instructed Johnston to investigate further.  (Weissman Decl. Ex. 130 at ECF 2).[2]  Johnston

determined Cocuzza engaged in criminal conduct.

---

[2]     "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case
Filing system.

In an email to Lieutenant Karl Mueller dated December 31, 2015, containing the subject line "Cocuzza," Dawson wrote:  "Karl, Nothing else to review, hopefully we will be hearing some good news very shortly."  (Goldman Decl. Ex. 18).

According to plaintiffs, on January 8, 2016, defendants issued disciplinary charges against Cocuzza and gave him the option to resign without being arrested.  (Weissman Decl. Ex. 131).  Cocuzza declined to resign and, thereafter, defendants charged Cocuzza with additional counts of wrongdoing stemming from additional work shifts.  Cocuzza invoked binding arbitration to resolve the administrative disciplinary charges.

On January 11, 2016, Cocuzza was arrested and criminally charged with seventeen counts of felony public records tampering, and fifty-one related misdemeanor counts. (Weissman Dec. Ex. 132).

On April 15, 2016, Kenneth Gribetz, Cocuzza's criminal attorney, issued an opinion letter, which Cocuzza acknowledged.  Therein, Gribetz advised Cocuzza that both he and Cocuzza's attorney in the disciplinary action believed it was in Cocuzza's best interest to "agree to resolve the criminal charges . . . by resigning and having the criminal charges ultimately dismissed so you can avoid having a criminal record."  (Weissman Decl. Ex. 145).  According to Gribetz, Cocuzza's pending criminal charges would be "reduced to misdemeanors" and "adjourned in contemplation of dismissal (ACD) after six months, during which [Cocuzza would not be] charged with any additional crimes."  (Id. at ECF 2).  Gribetz further noted that if Cocuzza did not agree to resign, the Rockland County District Attorney would present Cocuzza's charges to the grand jury on April 20, 2016.

On May 6, 2016, Cocuzza entered into a stipulation of settlement, pursuant to which he agreed to resign his position as a corrections officer and sign a general release, the disciplinary

charges were withdrawn, he was paid roughly $15,000 for vacation pay pursuant to the union's

collective bargaining agreement (see Weissman Decl. Ex. 148), and the County agreed to

provide Cocuzza a neutral letter of reference to any potential future employer.  Volpe and a

union representative also signed the settlement stipulation.  Cocuzza's general release exempted

the County, the County Sheriff, and Sheriff Falco, in his official and individual capacities:

> from all actions, causes of action, suits . . . damages, claims and demands
> whatsoever, in law . . . or equity, which . . . the Releasee . . . ever had, now have or
> hereafter can, shall or may, have for, upon or by reason by any matter, cause or
> thing whatsoever from the beginning of the world to the date of th[e] Release."

(Weissman Decl. Ex. 20 at ECF 4).

On May 9, 2016, the District Attorney reduced the criminal charges against Cocuzza to

one count of disorderly conduct.  That day, Cocuzza appeared before a Town Justice, admitted

that on August 20, 2015, he falsified five entries in a Jail logbook, claiming he conducted

physical checks of inmates when, in fact, he had not, and pleaded guilty to the disorderly conduct

charge in exchange for the District Attorney's dismissal of the sixty-eight felony and

misdemeanor counts.  (See generally Weissman Decl. Ex. 147).

In April 2017, during a hearing before the Workers' Compensation Board, Cocuzza

testified he resigned from his position as a corrections officer at the Jail because he "couldn't do

the job anymore" due to pain in his back and hand (Weissman Decl. Ex. 146 at 4), and that he

was not "forced out."  (Id. at 13).

VI.     Seminara's Disciplinary Charges and Resignation

During Cocuzza's arbitration proceedings in 2016, his attorney requested production of

all videos from 2015 showing the midnight shift on the intake housing unit and F-Wing isolation

units of the Jail, where suicide and precautionary watch inmates were housed.  According to

defendants, Dawson began to archive and copy the video footage, spot-checked the videos, and

noticed several other corrections officers engaged in potentially similar conduct.  Dawson wrote

a note to follow up on several corrections officers, including Millien, Seminara, Jeffrey Krichten,

Claude Daniels, Frank Farina, and an officer with the surname Arcuni.  (Goldman Decl. Ex. 20).

This list did not reference Esposito or Tchor.  (Id.).  According to plaintiffs, Dawson did not

pursue investigations of anyone on this list other than Millien and Seminara, who were known

Vasquez supporters and opponents of Sheriff Falco.

According to defendants, Dawson, along with Mueller and Sergeant David Marzella,

looked at additional footage of Seminara's shifts, and determined she slept during suicide watch

and missed required inmate checks on precautionary watch, but noted in logbooks that proper

checks had been completed.

Volpe referred this information to Johnston, who determined Seminara had falsified

logbooks.  Johnston drafted, but did not file, a felony complaint comprising twenty-seven counts

of felony public records tampering and eighty-one related misdemeanor counts.  (Weismann

Decl. Ex. 168).

On June 9, 2016, Volpe issued Seminara a suspension letter and notice of disciplinary

charges, alleging Seminara had failed to watch inmates on suicide watch and precautionary

watch, slept on duty, and falsified logbook entries.  By letter to Seminara's attorney dated June

21, 2016, the County scheduled an arbitration for July 7, 2016.

On July 12, 2016, Seminara entered into a stipulation of settlement, pursuant to which

she agreed to resign her position as a corrections officer and sign a general release, the

disciplinary charges were withdrawn, she was paid roughly $4,000 for vacation pay (see

Weissman Decl. Ex. 171), and the County agreed to provide a neutral letter of reference to any

potential future employer.  (Id. Ex. 22 at ECF 2).  Volpe, Seminara's attorney, and a union

representative also signed the settlement stipulation.  Seminara then signed a general release identical to the one signed by Cocuzza, releasing the County, the Sheriff's Department, and Sheriff Falco, from any and all claims Seminara had or may have against them.  (Id. at ECF 4).

After commencement of this lawsuit, on May 12, 2017, the Sheriff's Department provided the New York City Department of Correction a neutral response to an inquiry respecting Seminara's employment application (Weismann Del. Ex. 175), and on March 1, 2018, the Sheriff's Department did the same with respect to Seminara's employment application with the New York State Department of Corrections.  (Id. Ex. 176).

VII.    Esposito's Disciplinary Charges and Resignation

While spot-checking videos during the archival process for Cocuzza's arbitration, defendants claim Dawson also noticed Esposito engaging in potentially similar conduct. Following further investigation, Dawson, Mueller, and Marzella determined Esposito had missed required inmate checks during a precautionary watch on October 24-25, 2015, but marked in the logbook that he made such checks.

Volpe referred this information to Johnston, who determined Esposito had falsified logbooks.  Johnston drafted, but did not file, a felony complaint comprising five counts of felony public records tampering and fifteen related misdemeanor counts.  (Weismann Decl. Ex. 190).

On June 9, 2016, Volpe issued a suspension letter and notice of disciplinary charges against Esposito, alleging Esposito had failed to watch inmates on precautionary watch and falsified logbook entries.  (Weismann Decl. Ex. 189).  The County scheduled an arbitration for July 14, 2016.

On July 7, 2016, Esposito entered into a stipulation of settlement, pursuant to which he agreed to resign his position as a corrections officer and sign a general release, the disciplinary

charges were withdrawn, he was paid roughly $14,000 for vacation pay (see Weissman Decl. Ex. 192), and the County agreed to provide a neutral letter of reference to any potential future employer.  (Id. Ex. 21 at ECF 2).  Volpe, Esposito's attorney, and a union representative also signed the settlement stipulation.  Esposito then signed a general release identical to those signed by Cocuzza and Seminara.  (Id. at ECF 4).

VIII.    Millien's Disciplinary Charges, Criminal Charges, and Arbitration

According to defendants, Dawson also noticed, while spot-checking video footage, Millien engaging in improper conduct on duty.  Following further investigation, Dawson, Mueller, and Marzella determined Millien failed to supervise inmates on suicide and precautionary watch, and falsified logbooks.

On June 30, 2016, Volpe issued a suspension letter and notice of disciplinary charges against Millien, alleging Millien had failed to supervise an inmate on suicide watch, slept on duty, and falsified logbook entries on August 23, 2015, and failed to supervise inmates on precautionary watch and falsified logbook entries on August 28 and November 14, 2015.  (Weismann Decl. Ex. 211).

Volpe referred information about Millien to Johnston, who determined Millien engaged in criminal conduct.  (Weismann Decl. Ex. 212).  According to Johnston, Sheriff Falco advised Volpe to advise Millien to either resign or turn himself in for criminal processing.  (Id. at ECF 3).

Millien chose to dispute the disciplinary charges.  On July 20, 2016, Johnston filed a criminal complaint against Millien, comprising twenty-two counts of felony public records tampering and sixty-six related misdemeanor counts.  (Weissman Decl. Ex. 214).  That day, Millien was arrested and criminally processed.

During binding arbitration of Millien's disciplinary charges, the union, which represented Millien in arbitration, demonstrated that video evidence of the dates in question showed another corrections officer, Kirchten, a known supporter of Sheriff Falco, had violated suicide and precautionary watch rules as obviously as Millien had.  Moreover, the union proffered evidence that Dawson's initial investigatory notes showed Kirchten as one of several other corrections officers Dawson needed to investigate further, but did not.  Indeed, it was only until after this evidence was presented during Millien's arbitration that the County took disciplinary action against Kirchten.

Ultimately, the arbitrator determined Millien's termination was warranted because Millien had failed to supervise inmates on suicide and precautionary watch, and slept during a suicide watch.  However, the arbitrator found Millien not guilty of falsifying logbooks, because the Sheriff's Department, for years, had a relaxed policy of allowing officers to backdate logbook entries rather than entering same in real time.  Former employees with decades of experience at the Jail testified during the arbitration that the County's practice of completing logbook entries was much more lenient than the written policies respecting same, and that the written policies were never enforced.  For example, the record suggests that prior to defendants' pursuit of disciplinary charges against plaintiffs, it was commonplace for supervisors to allow corrections officers to backdate logbooks to demonstrate timely inmate checks, and that defendants did not pursue resignation of officers who did not timely conduct precautionary checks.

In light of the above, the arbitrator determined that, since Millien "and others who opposed Sheriff Falco in the 2015 election were disciplined and others (like [Kirchten]) who supported Sheriff Falco in the 2015 election were not initially prosecuted, there is obvious

selective prosecution." (Weissman Decl. Ex. 215 at 33). In other words, the arbitrator noted "a strong inference that the County has tolerated correction officer dereliction from supporters of Sheriff Falco while not tolerating it from Sheriff Falco's opponents." (Id.).

By letter dated March 17, 2017, Sheriff Falco terminated Millien's employment as a corrections officer, effective March 15, 2017. (Weismann Decl. Ex. 224). Also on March 17, 2017, the District Attorney reduced Millien's criminal charges to one count of disorderly conduct, to which Millien pleaded guilty. (Id. Ex. 228). During his plea allocution, Millien made note of the instant action and his intent to continue same. (Id. at 5–6).

IX.   Tchor's Disciplinary Charges and Resignation

According to defendants, while reviewing video footage of Esposito's shifts, Dawson, Mueller, and Marzella noticed Tchor failing to check on inmates during a precautionary watch on November 10-11, 2015.

On July 7, 2016, Volpe issued a suspension letter and notice of disciplinary charges against Tchor, alleging Tchor had failed to watch inmates on precautionary watch and falsified logbook entries. (Weismann Decl. Ex. 198). The County scheduled an arbitration for August 11, 2016.

Volpe referred Tchor's information to Johnston, who determined Tchor had falsified logbooks. Johnston drafted, but did not file, a felony complaint comprising fifteen counts of felony public records tampering and forty-five related misdemeanor counts. (Weismann Decl. Ex. 200 at ECF 4–5).

On July 22, 2016, Tchor entered into a stipulation of settlement, pursuant to which he agreed to resign his position as a corrections officer with the Jail and sign a general release, the disciplinary charges were withdrawn, he was paid roughly $4,000 for vacation pay (see

Weissman Decl. Ex. 202), and the County agreed to provide a neutral letter of reference to any

potential future employer.  (Id. Ex. 23 at ECF 2).  Sheriff's Department Captain John Liske,

Tchor's attorney, and a union representative also signed the settlement stipulation.  Tchor then

signed a general release identical to those signed by Cocuzza, Seminara, and Esposito.  (Id. at

ECF 4).

## DISCUSSION

I.    Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery

materials before the Court, and any affidavits show there is no genuine issue as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing

law. . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot

preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).[3]

A dispute about a material fact is genuine if there is sufficient evidence upon which a

reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby,

Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir.

2010).  It is the moving party's burden to establish the absence of any genuine issue of material

fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of his

case on which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp.

---

[3]    Unless otherwise indicated, case quotations omit all internal citations, quotations,
footnotes, and alterations.

v. Catrett, 477 U.S. at 322–23.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury reasonably could find for him.  Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper.  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).  "In determining whether there are genuine issues of material fact to be tried, the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individuals strands of evidence; rather, it must review all of the evidence in the record."  Davis-Garett v. Urban Outfitters, Inc., 921 F.3d 30, 45 (2d Cir. 2019).

In deciding a motion for summary judgment, the Court need consider only evidence that would be admissible at trial.  Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).  Accordingly, bald assertions, completely unsupported by admissible evidence, are not sufficient to overcome summary judgment.  Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

II.    General Releases, Duress, and Ratification

Defendants argue Cocuzza, Seminara, Esposito, and Tchor knowingly and voluntarily resigned, signed general releases with the advice of counsel and in exchange for assurances and other consideration.  These plaintiffs argue they executed their stipulations of settlement and general releases under duress.  Defendants further argue that plaintiffs' duress claims fail because these plaintiffs ratified the releases by retaining the benefits of same and failed timely to repudiate.

The Court agrees with defendants that, as a matter of law, Cocuzza cannot maintain claims against defendants, but disagrees with defendants with respect to Seminara, Esposito, and Tchor.

A.    Legal Standard

Settlement agreements and general releases "are contracts and must therefore be construed according to general principles of contract law." Collins v. Harrison-Bode, 303 F.3d 429, 433 (2d Cir. 2002).  The essential inquiry in determining the validity of a release of a federal claim "is whether, considering the 'totality of the circumstances,' the individual's waiver of his or her rights can be characterized as 'knowing and voluntary.'" United States v. N.Y.C. Dep't of Educ., 407 F. Supp. 3d 365, 413 (S.D.N.Y. 2018) (quoting Bormann v. AT&T Commc'ns, Inc., 875 F.2d 399, 402–03 (2d Cir. 1989).  Factors to be considered are:

> (1) the plaintiff's education and business experience, (2) the amount of time the plaintiff had possession of or access to the agreement before signing it, (3) the role of plaintiff in deciding the terms of the agreement, (4) the clarity of the agreement, (5) whether the plaintiff was represented by or consulted with an attorney, [ ] (6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law . . . , [and] (7) whether an employer encourages or discourages an employee to consult an attorney.

Bormann v. AT&T Commc'ns, Inc., 875 F.2d at 403.  Consideration of these factors generally

15

demands a "peculiarly fact-sensitive inquiry." Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437–38 (2d Cir. 1998).

Notwithstanding the above, "a resignation under coercion or duress is not a voluntary act and may be nullified." Ortlieb v. Lewis Cty. Sheriff's Dep't, 155 A.D.3d 1628, 1629 (4th Dep't 2017). To establish duress under New York law, a plaintiff must establish the existence of (i) a threat, (ii) unlawfully made, (ii) which caused involuntary acceptance of contract terms (iv) because the circumstances permitted no other alternative. Kamerman v. Steinberg, 891 F.2d 424, 431 (2d Cir. 1989).

"It is not duress to threaten to take action which is legally permissible." Kamerman v. Steinberg, 891 F.2d at 432. However, a threat of criminal prosecution "is an improper means of persuading a party to enter into a contract." Internet Mgmt. Info. Sys., Inc. v. Hanes Morgan & Co., 2000 WL 193127, at *4 (S.D.N.Y. Feb. 16, 2000). Indeed, "[t]he defense of duress is established upon the showing of a wrongful threat precluding the exercise of free will," and "the threat of criminal prosecution is sufficient for that purpose." Yoon Jung Kim v. An, 150 A.D.3d 590, 593 (1st Dep't 2017).

"[T]he person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so." VKK Corp. v. Nat'l Football League, 244 F.3d 114, 123 (2d Cir. 2001). "If the releasing party does not promptly repudiate the contract or release, he will be deemed to have ratified it." Id. "A party may ratify a contract or release entered into under duress by intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he had the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it." Id. However, if "during the period of acquiescence or at the time of the alleged ratification the disaffirming party

16

is still under the same continuing duress, he has no obligation to repudiate until the duress has

ceased." Yoon Jung Kim v. An, 150 A.D.3d at 593.

     B.     Seminara, Esposito, and Tchor

     Here, there are genuine issues of material fact as to whether Seminara, Esposito, and

Tchor executed their settlement agreements and general releases under duress.

     Defendants correctly point to evidence that suggests knowing and voluntary waiver—for

example, that these plaintiffs were educated, represented by counsel, and received assurances

and consideration in exchange for their agreements to resign and disclaim any causes of action or

claims they had or might have against defendants.

     However, a reasonable factfinder could conclude, on the record as a whole, that these

plaintiffs executed settlement agreements and general releases while faced with threats of

criminal prosecution.  Indeed, Seminara, Esposito, and Tchor claim having been told that if they

did not resign, they would be criminally charged for their apparent wrongdoing.  (See Weissman

Decl. Ex. 8 ("Seminara Tr.") at 64, 78; id. Ex. 6 ("Tchor Tr.") at 64, 132; Doc. #125 ("Esposito

Decl.") ¶¶ 20–21).  When Seminara, Esposito, and Tchor executed their releases, no criminal

charges had been filed, although felony complaints had been drafted.  And as an additional

matter, Seminara, Esposito, and Tchor claim they did not see the settlement and release

agreements until the moment they were presented with them, the day they were signed.

     A reasonable factfinder could also conclude these plaintiffs timely repudiated their

releases when they commenced the instant action.  Repudiation generally is an issue of fact,

DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 112 (2d Cir. 2010), and New York courts have

not established a bright line rule regarding what constitutes timely repudiation before a party will

be deemed to have ratified an agreement.  See Leser v. U.S. Bank Nat'l Ass'n, 2012 WL

4472025, at *20 (E.D.N.Y. Sept. 25, 2012).

 Plaintiffs commenced this lawsuit in December 2016, about five months after Tchor

signed a general release, and six months after Seminara and Esposito did the same.  A reasonable

factfinder could conclude the temporal proximity between these plaintiffs' resignations and the

commencement of this case satisfies plaintiffs' obligation to promptly repudiate, especially if

future threats of criminal prosecution persisted prior to the commencement of this action.  See

Yoon Jung Kim v. An, 150 A.D.3d at 593 (noting that if "during the period of acquiescence or at

the time of the alleged ratification the disaffirming party is still under the same continuing

duress, he has no obligation to repudiate until the duress has ceased.").  Moreover, that these

plaintiffs have not returned vacation pay paid as a condition for their resignation raises a material

issue of fact respecting ratification as well.  Cf. id.

 Accordingly, the record evidence raises genuine issues of material fact as to whether

Seminara, Esposito, and Tchor knowingly and voluntarily waived their rights to bring claims

against defendants, whether they executed their settlement and release agreements under duress,

and whether they promptly repudiated their agreements.

 C. Cocuzza

 Defendants contend Cocuzza cannot, as a matter of law, demonstrate a material issue of

fact as to whether he knowingly and voluntarily resigned and executed a release, or demonstrate

he executed his settlement and release agreements under duress.

 The Court agrees.

 Here, defendants correctly point to evidence suggesting Cocuzza knowingly and

voluntarily executed the settlement and release agreements, for example, that he was educated,

represented by counsel, negotiated his resignation, and received assurances and consideration in exchange for his agreement to resign and disclaim any causes of action or claims he had or might have against defendants.

Moreover, Cocuzza had already been criminally charged, in January 2016, with multiple felonies and misdemeanors when he executed the settlement and release agreements. And as a result of his resignation and release, Cocuzza's disciplinary charges were dropped, his criminal charges were reduced within days, and he pleaded guilty to one count of disorderly conduct. Accordingly, after Cocuzza finalized his resignation, he, unlike Seminara, Esposito, and Tchor, was not subjected to a looming threat of future criminal prosecution following his resignation and delivery of a general release. Accordingly, the record evidence demonstrates Cocuzza was not faced with the same future threat of criminal prosecution when he executed his settlement and release agreements.

Cocuzza argues he resigned and executed the release due to economic duress, because "fighting the criminal charges entailed the expenditure of tens of thousands of dollars" he could not afford. (Doc. #139 ("Pls. Mem.") at 14). The Court is not persuaded. "[A] mere demonstration of financial pressure or unequal bargaining power will not, by itself, establish economic duress." McMahon v. Napolitano, 2015 WL 1370700, at *6 (E.D.N.Y. Aug. 27, 2015) (quoting Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n, 655 F.3d 136, 142 (2d Cir. 2011). Moreover, as noted above, criminal charges against Cocuzza had been brought several months before Cocuzza determined to resign.

In addition, Cocuzza's sworn testimony during his April 2017 Workers' Compensation hearing further constrains Cocuzza's ability to raise a genuine issue of fact with respect to his duress allegations. At that hearing, Cocuzza testified under oath that he resigned due to injury,

and that he was not forced out of his position as a corrections officer at the Jail.  Accordingly, pursuant to his sworn testimony, Cocuzza cannot demonstrate an issue of fact as to whether defendants caused his "involuntary acceptance of contract terms" vis-à-vis his May 2016 settlement and release agreements.  See Kamerman v. Steinberg, 891 F.2d 424.

For the above reasons, as a matter of law, defendants are entitled to summary judgment with respect to Cocuzza's claims.  However, genuine issues of fact concerning the releases of Seminara, Esposito, and Tchor preclude summary judgment in defendants' favor.

III.   First Amendment Retaliation Claims

Defendants further argue plaintiffs cannot as a matter of law establish First Amendment retaliation claims.

The Court disagrees.

"A plaintiff asserting a First Amendment retaliation claim must establish that:  "(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected [conduct]."  Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir. 2015).  "Once a plaintiff has presented such evidence, the defendant may respond by showing, by a preponderance of the evidence, that it would have taken the same adverse employment action regardless of the plaintiff's conduct."  Bierce v. Town of Fishkill, 656 F. App'x 550, 552 (2d Cir. 2016) (summary order).

A.      Protected Activity

1.      Lans

Defendants argue Lans cannot, as a matter of law, establish he engaged in known protected activity because the record evidence fails to suggest Lans was known by defendants to be a Vasquez supporter or was actively involved in union activity.

The Court disagrees.

At his deposition, Lans acknowledged he was not present for Vasquez's public campaign announcement in March 2015, and that he did not engage in any public union activity in support of Vasquez.  (Weissman Decl. Ex. 7 at 18, 30–31).  He did, however, testify that while working at the Jail, he frequently spoke openly about his opposition to Falco, and his support of and intent to vote for Vasquez.  (Id. at 34–36).  He further testified the Jail "is small and we all talked."  (Id. at 34).

Based on the record evidence, a reasonable juror could conclude Lans was known by defendants to be a Vasquez supporter when he was threatened with disciplinary charges and defendants sought his employment termination.

2.      Esposito

Defendants next argue Esposito cannot, as a matter of law, establish a known protected activity that substantially motivated defendants to pursue disciplinary charges against him, because Esposito was not known to be a Vasquez supporter, did not attend any public events to support Vasquez, and testified that prior to the 2015 election, he did not speak to anyone about the election.

The Court disagrees.

In Heffernan v. City of Paterson, 136 S. Ct. 1412, 1416 (2016), the Supreme Court held

that a perceived protected activity, in the absence of an actual protected activity, can nevertheless give rise to an actionable First Amendment relation claim.

Here, Esposito testified he was good friends with Sgt. Falco IV (Sheriff Falco's son), and that he believed defendants sought his resignation because "by throwing [him] into the mix, [defendants] could say Esposito is a Falco supporter, we didn't just go after Vasquez supporters." (Weissman Decl. Ex. 5 at 113).  Esposito further testified Sheriff Falco and many others at the Jail believed he supported Sheriff Falco in the 2015 election (id. at 113–116), although defendants testified they did not so believe.  Moreover, Esposito testified Chief Volpe told him defendants were fearful of a potential lawsuit by Cocuzza and McNichol based on defendants' pursuit of their employment termination, and if it had not been for that belief, then Esposito would not have been issued disciplinary charges and defendants would not have sought his resignation.  (Id. at 54–55, 113).  In other words, Esposito testified defendants, who believed him to be a Falco supporter, used him as a "scapegoat" to lessen the appearance of a patterned, retaliation campaign against certain Vasquez supporters.  (Id. at 112).

Based on Esposito's testimony, a reasonable juror could conclude defendants perceived Esposito as a Falco supporter and that such perception was a motivating factor in defendants' pursuit of disciplinary charges against Esposito.  Accordingly, plaintiffs raise a genuine issue of material fact as to whether defendants took certain action against Esposito based on a perceived protected activity.

     B.    <u>Causal Connection</u>

Defendants further argue plaintiffs cannot as a matter of law establish First Amendment retaliation claims because, based on the record evidence, a reasonable juror cannot infer a causal link between plaintiffs' political activities and any adverse employment actions.

Again, the Court disagrees.

"To establish causation, a plaintiff must show that his protected activity was a substantial motivating factor in the adverse employment decision." Bierce v. Town of Fishkill, 656 F. App'x at 552. "This may be done either directly, by evidence of retaliatory animus, or indirectly, by circumstantial evidence, such as by showing that the protected activity was closely followed in time by the adverse employment decision." Id. The "historical background of the decision . . . particularly if it reveals a series of official actions for invidious purposes," as well as the "sequence of events leading up to the challenged decision" also may provide circumstantial evidence of causation. See Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267 (1977). Soo too can "departures from procedural regularity." Stern v. Trs. of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997). Moreover, "for protected conduct to be a substantial or motivating factor in a decision, the decision makers must be aware of the protected conduct." Wrobel v. County of Erie, 692 F.3d at 32.

Here, a reasonable juror could infer, based on the record evidence, a causal connection between plaintiffs' protected activities and adverse employment actions. In other words, a reasonable juror could conclude that defendants' pursuit of plaintiffs' resignations and/or criminal prosecution was motivated by plaintiffs' First Amendment association or speech.

For example, a reasonable juror could conclude Dawson's December 31, 2015, email concerning Cocuzza, which reads "[n]othing else to review, hopefully we will be hearing some good news very shortly" (Goldman Decl. Ex. 18), sent shortly after defendants issued disciplinary charges against McNichol, highlights defendants' motivation to pursue adverse employment actions against known Vasquez supporters and union opposition.

In addition, the record evidence suggests defendants knew of other corrections officers—Sheriff Falco supporters—who either slept during suicide watch, failed timely to check on inmates during precautionary watch, or falsified logbook entries, but that defendants did not pursue disciplinary or criminal actions against such officers. The record also raises questions of fact as to defendants' reasons for failing to take similar action against those officers as was taken against plaintiffs. Indeed, during Millien's arbitration, the union presented evidence that defendants did not pursue disciplinary or criminal action against a Sheriff Falco supporter who can be seen violating suicide and precautionary watch requirements in the same videos defendants had reviewed. Although defendants ultimately sought disciplinary charges against that individual, they had not done so until this evidence was presented by the union. Accordingly, the arbitrator noted in his findings that Millien "and others who opposed Sheriff Falco in the 2015 election were disciplined and others . . . who supported Sheriff Falco in the 2015 election were not initially prosecuted," suggesting "obvious selective prosecution." (Weissman Decl. Ex. 215 at 33). The arbitrator further noted "a strong inference that the County has tolerated correction officer dereliction from supporters of Sheriff Falco while not tolerating it from Sheriff Falco's opponents." (Id.). Accordingly, there exist questions of fact as to whether plaintiffs' protected activities sparked defendants' disciplinary efforts.

Defendants argue plaintiffs fail to proffer evidence that their protected First Amendment activity was closely followed in time by some adverse employment action. The Court is not persuaded. Sheriff Falco was reelected on November 3, 2015. Two days later, defendants served McNichol with disciplinary charges. The following month, defendants sought Lans's resignation, and shortly thereafter, Cocuzza's. The record evidence further suggests that a few months later, after defendants had archived video, they pursued disciplinary charges against

Seminara, Tchor, Esposito, and Millien, but did not pursue similar action against other individuals who were also thought to have violated suicide and precautionary watch obligations based on review of the same archived video footage.  Accordingly, at minimum, the record evidence raises questions of fact respecting the temporal proximity between plaintiffs' protected activity up until the November 3, 2015, election, and defendants' pursuit of plaintiffs' resignations thereafter.

Defendants further argue plaintiffs cannot establish a causal connection between their protected activity and an adverse employment action because the record evidence demonstrates certain Vasquez supporters received favorable employment treatment.  For instance, defendants point out Dan Dworkin, a union executive board member, was promoted to sergeant around the time Seminara, Esposito, Millien, and Tchor were charged, that other Vasquez supporters received outstanding employment reviews, and that, after publicly endorsing Vasquez, Millien, Seminara, and Tchor received "above average" year-end employment evaluations.  (Doc. #111 ("Defs. Mem.") at 20).

The Court is not persuaded by this argument as well.  There exist questions of fact as to whether defendants—high-level Sheriff's Department administrators—were involved in Millien, Seminara, and Tchor's performance reviews.  Moreover, defendants' argument improperly suggests defendants must have treated all Vasquez supporters alike to have retaliated against any. It is true that defendants' proffered evidence on this issue raises doubts as to plaintiffs' theory respecting defendants' motivation for pursuing discipline against plaintiffs.  But such doubt creates an issue of fact as to causation and motivation.

In addition, as to Esposito, defendants argue a reasonable juror cannot infer a causal connection because when Esposito was charged in June 2016, he was on probation for unrelated

discipline.  This argument misses the mark.  With respect to the disciplinary action at issue in this case, as noted above, a reasonable juror could conclude Esposito's perceived First Amendment activity spurred adverse employment action.

Furthermore, as noted herein, the record evidence raises questions of fact as to whether defendants knew Seminara, Lans, Tchor, Millien, and McNichol were Vasquez supporters during the 2015 election, and whether defendants perceived Esposito to be a Falco supporter.

Accordingly, viewing the record in the light most favorable to plaintiffs, a reasonable juror could infer, based on the record as a whole, a causal link between plaintiffs' protected activities and their adverse employment actions.

C.      *Mount Healthy* Defense

Defendants argue that even if the record establishes a prima facie case of First Amendment retaliation, defendants are nevertheless entitled to summary judgment pursuant to Mount Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 285–86 (1977).

The Court disagrees.

Once a plaintiff establishes a prima facie First Amendment retaliation claim, defendants may assert as "a defense that they would have taken the same adverse action even absent the protected activity—the so-called Mount Healthy defense."  Hughes v. Town of Bethlehem, 644 F. App'x 49, 51 (2d Cir. 2016) (summary order).

"Defendants must prove a Mount Health defense by a preponderance of the evidence." Id.  In so doing, "defendants . . . may not rely solely on the occurrence of unprotected misconduct; they must also articulate and substantiate a reasonable link between that misconduct and their specific adverse actions."  Smith v. County of Suffolk, 776 F.3d 114, 123 (2d Cir. 2015).

"Mt. Healthy teaches that state action taken on the basis of both valid and invalid motivations is not constitutionally tainted by the invalid motive if the action would in any event have been taken on the constitutionally valid basis."  Sher v. Coughlin, 739 F.2d 77, 82 (2d Cir. 1984).  "Thus, it is insufficient to show that the [defendants] might have or could have [taken adverse action] on some legitimate grounds."  Zehner v. Jordan-Elbridge Bd. of Educ., 666 F. App'x 29, 32 (2d Cir. 2016 (summary order).  In other words, the Mount Healthy defense is tantamount to the following hypothetical question:  "Would the defendant have taken the same adverse action even if the impermissible reason had not existed?"  Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency, 77 F.3d 26, 32 (2d Cir. 1996).

Here, the record evidence raises genuine issues of material fact as to whether defendants would have taken adverse action against plaintiffs in the absence of their protected activity. Indeed, a reasonable juror, in view of the parties' proffered evidence, could reasonably conclude that, absent plaintiffs' protected activity, defendants would not have enforced Jail policy respecting suicide and precautionary watches, or pursued disciplinary and/or criminal action against plaintiffs.  In other words, a reasonable juror could conclude that but for plaintiffs' protected activity, defendants would not have conducted investigations of plaintiffs' conduct.

This is not to say defendants were, or should be, precluded from enforcing Jail policies to protect inmates in their charge.  But here, a reasonable juror could conclude defendants did so in a retaliatory effort against plaintiffs for their protected First Amendment activity, and would not have done so otherwise.

Moreover, to the extent defendants argue the Mount Healthy defense applies as a matter of law to Millien because a neutral arbitrator concluded his employment should be terminated even if defendants had engaged in selective prosecution, such argument fails.  Here again, the

27

record raises genuine issues of material fact as to whether defendants would have pursued an investigation of, and disciplinary charges against, Millien absent protected activity.  Millien's arbitration did not bear on unlawful First Amendment retaliation.

For these reasons, questions of fact preclude summary judgment pursuant to the Mount Healthy defense.

IV.   Equal Protection

Defendants generally argue that, to the extent plaintiffs raise Fourteenth Amendment selective enforcement or prosecution claims, such claims fail as a matter of law.

The Court disagrees.

"Where, as here, an equal protection claim is based on an alleged First Amendment violation, the former coalesces with the latter."  Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals, 812 F. Supp. 2d 357, 372 (S.D.N.Y. 2011).  "Where this is the case, the equal protection claim is dependent on the First Amendment claim; in other words[,] where the First Amendment claim has failed, the equal protection claim fails, too."  Id.

Having denied defendants' motion for summary judgment with respect the First Amendment retaliation claims of McNichol, Millien, Seminara, Esposito, Lans, and Tchor, defendants' motion is also denied to the extent it seeks summary judgment with respect to plaintiffs' equal protection claims.

V.   Abuse of Process

Defendants argue that to the extent and plaintiff raises an abuse of process claim, such claim fails as a matter of law.

The Court disagrees.

"To prevail on a claim for abuse of process under § 1983 and New York law, a plaintiff must show that a defendant (1) employed regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to establish a collateral objective that is outside the legitimate ends of the process." Gier v. City of Mount Vernon, 2019 WL 1171760, at *5 (S.D.N.Y. Mar. 13, 2019). "While the existence of probable cause may not be a complete defense to an abuse of process claim, it may be probative in a court's assessment." Id. (quoting Mangino v. Inc. Vill. of Patchogue, 814 F. Supp. 2d 242, 248 (E.D.N.Y.), aff'd, 808 F.3d 951, 959 (2d Cir. 2015). Indeed, "probable cause functions as a defense when the only evidence of improper purpose is the alleged lack of probable cause." Rao v. City of New York, 2018 WL 1582289, at *10 (E.D.N.Y. Mar. 29, 2018).

Here, based on the evidentiary record and as discussed herein, a reasonable juror could conclude defendants drafted and/or filed felony complaints, or threatened plaintiffs with criminal prosecution, for an "improper purpose," despite the existence of probable cause. See Savino v. City of New York, 331 F.3d 63, 77 (2d Cir. 2003). Accordingly, defendants are not entitled to summary judgment with respect to any abuse of process claim.

VI.   Personal Involvement

Finally, defendants argue Sheriff Falco is entitled to summary judgment as a matter of law for lack of personal involvement in any alleged constitutional violation.

The Court disagrees.

During his deposition, Sheriff Falco testified he approved disciplinary charges and the drafting of felony complaints in this matter, although he later stated he approved criminal charges only (Weismann Decl. Ex. 10 at 191–95, 197). Even still, he further testified he was

advised in advance of disciplinary charges being brought against McNichol in November 2015. (Id. at 199). The record evidence further suggests that with respect to at least some plaintiffs, Sheriff Falco requested Johnston review video footage to determine whether criminal charges should be brought, although Falco testified he did not look at any video recordings or participate in any investigation. Moreover, McMichol attested that during the 2015 election, Falco expressed his discontent with the union and its Vasquez supporters, and told McNichol that "we would see what will happen" when he won reelection. (McNichol Decl. ¶ 13).

Simply put, in view of the evidence mentioned above and herein, material issues of fact preclude a determination that, as a matter law, Sheriff Falco was not personally involved in allegedly unconstitutional conduct. Rather, a reasonable factfinder could conclude Sheriff Falco was personally involved.

For the above reasons, summary judgment in favor of Sheriff Falco is not warranted on the ground of lack of personal involvement.

## CONCLUSION

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Plaintiff John Cocuzza's claims are dismissed. All other claims shall proceed.

Counsel are directed to appear for a telephone status conference on October 22, 2020, at 12:00 p.m., at which time the parties shall be prepared to discuss, among other things, the setting of a trial date and a schedule for pretrial submissions, and what efforts they have made or will make to settle this case. In light of the current public health crisis, the conference will be conducted by telephone conference. Counsel shall attend the conference by calling the following number and entering the access code when requested:

**Dial-In Number:**       **(888) 363-4749 (toll free) <u>or</u> (215) 446-3662**

**Access Code:**          **1703567**

The Clerk is instructed to terminate the motion (16 Civ. 9868 Doc. #109).

Dated: September 28, 2020
       White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge